# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| NUIQSUT TRILATERAL, INC., ) | |
| ) | |
| Plaintiff, ) | Case No. 1:26-cv-239-AHA |
| ) | |
| v. ) | |
| ) | |
| DOUG BURGUM, in his official capacity ) | |
| as Secretary of the Interior, *et al.*, ) | |
| ) | |
| Defendants. ) | |

## DEFENDANTS' MEMORANDUM IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................ 1

BACKGROUND ............................................................................................................... 1

    A.      Statutory Background ...................................................................................... 1

           1.      Naval Petroleum Reserves Production Act ................................. 1

           2.      One Big Beautiful Bill Act ........................................................ 4

           3.      Congressional Review Act ......................................................... 4

    B.      Factual and Procedural Background ................................................................ 4

LEGAL STANDARDS ...................................................................................................... 7

    I.       A Preliminary Injunction is an Extraordinary Remedy ......................................... 7

    II.      Administrative Procedure Act Review of Final Agency Action ........................... 8

ARGUMENT ................................................................................................................... 10

    I.       Plaintiff Fails to Show a Likelihood of Imminent, Irreparable Injury ................. 10

    II.      Plaintiff is Unlikely to Succeed on the Merits ................................................... 14

           A.      A Prohibition on Leasing in the TLCROW Is Unlawful ......................... 15

           B.      Plaintiff's Assorted Arguments Cannot Overcome Congressional
                Direction ................................................................................................ 18

                1.      Interior Properly Exercised Authority to Cancel the
                      TLCROW ....................................................................... 18

                2.      Interior Properly Found the TLCROW to Be an Unlawful
                      Sub-Delegation ............................................................... 20

                  3.      Plaintiff's Procedural Roadblocks All Fail ...................................... 21

    III.    The Balance of Equities and Public Interest Favor Defendants ......................... 25

    IV.    Any Injunction Must Be Narrowly Tailored ..................................................... 25

CONCLUSION ............................................................................................................... 26

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*Am. Bioscience, Inc. v. Thompson*,
243 F.3d 579 (D.C. Cir. 2001)......................................................................................... 14

*Am. Radio Relay League, Inc. v. FCC*,
617 F.2d 875 (D.C. Cir. 1980)........................................................................................... 9

*Am. Rivers v. U.S. Army Corps of Eng'rs*,
271 F. Supp. 2d 230 (D.D.C. 2003)................................................................................... 9

*Amoco Prod. Co. v. Fry*,
118 F.3d 812 (D.C. Cir. 1997)......................................................................................... 24

*Amoco Prod. Co. v. Vill. of Gambell*,
480 U.S. 531 (1987)......................................................................................................... 11

*Blanco v. Burton*, No. Civ.A.,
06-3813, 2006 WL 2366046 (E.D. La. Aug. 14, 2006)................................................... 11

*\*Boesche v. Udall*,
373 U.S. 472 (1963)................................................................................................. 19, 23

*Bradley v. Vill. of Univ. Park, Ill.*,
59 F.4th 887 (7th Cir. 2023)........................................................................................... 24

*Califano v. Yamasaki*,
442 U.S. 682 (1979)......................................................................................................... 24

*Cal. Ass'n Priv. Postsecondary Sch. v. DeVos*,
344 F. Supp. 3d 158 (D.D.C. 2018)................................................................................. 11

*Cameron v. United States*,
252 U.S. 450 (1920)......................................................................................................... 18

*Camp v. Pitts*,
411 U.S. 138 (1973)........................................................................................................... 9

*Chamber of Com. of U.S. v. NLRB*,
118 F. Supp. 3d 171 (D.D.C. 2015)................................................................................... 9

*Chaplaincy of Full Gospel Churches v. England*,
454 F.3d 290 (D.C. Cir. 2006)....................................................................................... 10

*City of Olmsted Falls v. FAA,*
  292 F.3d 261 (D.C. Cir. 2002) ....................................................................... 9

*Cobell v. Norton,*
  391 F.3d 251 (D.C. Cir. 2004) ....................................................................... 7

*ConocoPhillips Alaska, Inc. v. Alaska Oil & Gas Conservation Comm'n,*
  660 F. Supp. 3d 822 (D. Alaska 2023) .......................................................... 2

*Consumer Elecs. Ass'n v. FCC,*
  347 F.3d 291 (D.C. Cir. 2003) ..................................................................... 19

*Dep't of Transp. v. Pub. Citizen,*
  541 U.S. 752 (2004) ..................................................................................... 23

*DSE, Inc. v. United States,*
  169 F.3d 21 (D.C. Cir. 1999) ....................................................................... 26

*eBay Inc. v. MercExchange, LLC,*
  547 U.S. 388 (2006) ..................................................................................... 23

*Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.,*
  556 U.S. 502 (2009) ..................................................................................... 22

*Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of,*
  *Okla.*, 426 U.S. 776 (1976) .......................................................................... 23

*\*Gwich'in Steering Comm. v. Bernhardt,*
  No. 3:20-cv-204-SLG, 2021 WL 46703 (D. Alaska Jan. 5, 2021) ............. 11, 12, 13

*Hall v. McLaughlin,*
  864 F.2d 868 (D.C. Cir. 1989) ....................................................................... 9

*Kleppe v. New Mexico,*
  426 U.S. 529 (1976) ..................................................................................... 16

*Lomak Petroleum, Inc. v. FERC,*
  206 F.3d 1193 (D.C. Cir. 2000) ................................................................... 10

*Loper Bright Enters. v. Raimondo,*
  603 U.S. 369 (2024) .................................................................................. 9, 10

*Lujan v. Nat'l Wildlife Fed'n,*
  497 U.S. 871 (1990) ..................................................................................... 13

*MediNatura, Inc. v. FDA,*
  998 F.3d 931 (D.C. Cir. 2021) ..................................................................... 23

*Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,*
  463 U.S. 29 (1983) ......................................................................................... 9

*N. Alaska Env't Ctr. v. Kempthorne ("NAEC I"),
    457 F.3d 969 (9th Cir. 2006) ............................................................................... 1

N. Alaska Env't Ctr. v. U.S. Dep't of the Interior ("NAEC II"),
    983 F.3d 1077 (9th Cir. 2020) ............................................................................. 2

*Nat'l Audubon Soc'y v. Haaland,
    No. 3:20-cv-206-SLG, 2023 WL 5984204 (D. Alaska Sept. 14, 2023) .............. 2, 3, 4, 5, 6, 11

Nat'l Park & Conservation Ass'n v. Stanton,
    54 F. Supp. 2d 7 (D.D.C. 1999) ................................................................. 19, 20, 21

Nat'l Petrochemical & Refiners Ass'n v. EPA,
    287 F.3d 1130 (D.C. Cir. 2002) ........................................................................... 9

Nat'l Wildlife Fed'n v. Burford,
    676 F. Supp. 271 (D.D.C. 1985) ......................................................................... 13

National Wildlife Federation v. Burford,
    835 F.2d 305 (D.C. Cir. 1987) ..................................................................... 12, 13

Nken v. Holder,
    556 U.S. 418 (2009) ............................................................................................ 23

North Slope Borough v. Andrus,
    486 F. Supp. 326 (D.D.C. 1979) ......................................................................... 12

North Slope Borough v. Minerals Mgmt. Serv.,
    No. 3:07-cv-45-RRB, 2007 WL 1106110 (D. Alaska Apr. 12, 2007) ................. 11

PPL Wallingford Energy LLC v. FERC,
    419 F.3d 1194 (D.C. Cir. 2005) ........................................................................... 9

Pursuing Am.'s Greatness v. FEC,
    831 F.3d 500 (D.C. Cir. 2016) ........................................................................... 23

Red Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs,
    No. 20-cv-3817 (CKK), 2021 WL 430054 (D.D.C. Feb. 7, 2021) ..................... 14

Shiny Rock Min. Corp. v. United States,
    825 F.2d 216 (9th Cir. 1987) ............................................................................. 24

Silver State Land, LLC v. Schneider,
    843 F.3d 982 (D.C. Cir. 2016) ........................................................................... 19

Texaco, Inc. v. Hickel,
    437 F.2d 636 (D.C. Cir. 1970) ........................................................................... 19

Texas Oil & Gas Corp. v. Andrus,
    498 F. Supp. 668 (D.D.C. 1980) ......................................................................... 19

*Texas Oil & Gas Corp. v. Watt*,
  683 F.2d 427 (D.C. Cir. 1982) ................................................................. 19

*Tribal Vill. of Akutan v. Hodel*,
  859 F.2d 662 (9th Cir. 1988) ................................................................... 11

*Trout Unlimited v. U.S. Dep't of Agric.*,
  320 F. Supp. 2d 1090 (D. Colo. 2004) ..................................................... 8

*Trout Unlimited v. U.S. Dep't of Agric.*,
  944 F. Supp. 13 (D.D.C. 1996) ................................................................ 8

*Trump v. CASA, Inc.*,
  606 U.S. 831 (2025) ................................................................................ 24

*U.S. Telecom Ass'n v. F.C.C.*,
  359 F.3d 554 (D.C. Cir. 2004) ................................................................. 19

*Univ. of Tex. v. Camenisch*,
  451 U.S. 390 (1981) ................................................................................ 10

*WildEarth Guardians v. Salazar*,
  741 F. Supp. 2d 89 (D.D.C. 2010) ............................................................ 9

*Winkler v. Andrus*,
  614 F.2d 707 (10th Cir. 1980) ................................................................. 19

*Winter v. Nat. Res. Def. Council, Inc.*,
  555 U.S. 7 (2008) ................................................................. 7, 13, 19, 24

*Wisc. Gas Co. v. FERC*,
  758 F.2d 669 (D.C. Cir. 1985) ................................................................. 10

*Zevallos v. Obama*,
  793 F.3d 106 (D.C. Cir. 2015) ................................................................... 9

**Statutes**

42 U.S.C. § 6502 ........................................................................................ 15

42 U.S.C. § 6504(a) ...................................................................................... 3

42 U.S.C. § 6506a ................................................................................. 2, 15

43 U.S.C. § 1732(a) ...................................................................................... 2

43 U.S.C. § 2 .............................................................................................. 18

5 U.S.C. § 705 ..................................................................................... 3, 7, 25

5 U.S.C. § 706 ............................................................................................ 14

5 U.S.C. § 706(2)(A) ............................................................................................ 8

5 U.S.C. § 801(f) ............................................................................................ 4, 17

5 U.S.C. §§ 701-706 ............................................................................................ 8

5 U.S.C. §§ 801-808 ............................................................................................ 4

Pub. L. No 119-21, 139 Stat. 72 (July 4, 2025) ................................................ 3

Pub. L. No. 94-258, 90 Stat. 303 (April 5, 1976) ............................................. 2

Pub. L. No. 96-514, 94 Stat. 2957 (December 12, 1980) ............................ 2, 15

 **Regulations**

43 C.F.R. Part 3130 ........................................................................................... 11

**Other Authorities**

90 Fed. Reg. 48446 (Oct. 22, 2025) ................................................................... 7

90 Fed. Reg. 51470 (Nov. 7, 2025) .................................................................... 2

91 Fed. Reg. 6248 (Feb. 11, 2026) ..................................................................... 7

## INTRODUCTION

Plaintiff contends it will be irreparably harmed if this Court does not enjoin the Department of the Interior from opening bids on March 18, 2026, for an oil and gas lease sale in the National Petroleum Reserve in Alaska ("NPR-A").  This request parallels the one made in a similar motion for preliminary injunction filed by the Plaintiffs in *Grandmothers Growing Goodness v. Burgum*, No. 26-cv-513-AHA, also assigned to this Court.  But Plaintiff ignores prior rulings in the District of Alaska holding that the mere issuance of oil and gas leases does not warrant preliminary injunctive relief.  And Plaintiff's choice of venue seeks to avoid the considerable involvement of the Alaska district court and the Ninth Circuit, in the hopes of obtaining contradictory rulings from this Court through the burden and distraction of a fast-burning motion for preliminary injunction on this Court's docket.

The Court should not reward these efforts.  Defendants have moved in both cases to transfer venue to the District of Alaska.  And the Court should grant those motions while denying the motions for preliminary injunction without prejudice to refile them on the Alaska court's docket.  If the Court decides to further engage these improvidently filed motions for a preliminary injunction, it should deny them.  A preliminary injunction is an extraordinary remedy, and it is unwarranted here.

## BACKGROUND

### A.    Statutory Background

1.    Naval Petroleum Reserves Production Act

The 23.6 million acre NPR-A was originally established by executive order in 1923 as the Naval Petroleum Reserve #4.  *See N. Alaska Env't Ctr. v. Kempthorne* ("*NAEC I*"), 457 F.3d

969, 973 (9th Cir. 2006).  In 1976, Congress enacted the Naval Petroleum Reserves Production

Act ("Petroleum Reserves Act"), Pub. L. No. 94-258, 90 Stat. 303, transferring administrative

jurisdiction to the Secretary of the Interior and redesignating the area as the "National Petroleum

Reserve in Alaska."  Congress provided certain directives within the Petroleum Reserves Act,

including establishing oil and gas exploration activities as a management priority.  *See* Final

Rule, 90 Fed. Reg. 51,470, 51,471 (Nov. 7, 2025).  "[A]s a result, [the Petroleum Reserves Act]

is considered a dominant-use statute."  *Id*.  That is, BLM does not manage the NPR-A for

"multiple use and sustained yield," *Id.*, as it does for most other public lands under the Federal

Land Policy and Management Act of 1976.  *See* 43 U.S.C. § 1732(a).

To address the 1979 oil crisis and quickly move from federal to private oil development,

Congress amended the Petroleum Reserves Act in 1980, directing the Secretary to undertake "an

expeditious program of competitive leasing of oil and gas in the [NPR-A]."  Dep't of the Interior

Appropriations Act for Fiscal Year 1981, Pub. L. No. 96-514, 94 Stat. 2957, 2964-65 (1980); *see

also ConocoPhillips Alaska, Inc. v. Alaska Oil & Gas Conservation Comm'n*, 660 F. Supp. 3d

822, 834 (D. Alaska 2023).  To that end, the Petroleum Reserves Act directs BLM "to lease . . .

land [in the NPR-A] to private entities for oil and gas development, while taking such measures

as BLM deems necessary or appropriate to mitigate adverse environmental impacts."  *N. Alaska

Env't Ctr. v. U.S. Dep't of the Interior* ("*NAEC II*"), 983 F.3d 1077, 1081 (9th Cir. 2020) (citing

42 U.S.C. § 6506a).  In carrying out this mandate, BLM initially prepares an Integrated Activity

Plan ("IAP"), which establishes a programmatic framework to guide land management at a broad

scale.  *See NAEC II*, 983 F.3d at 1082 (describing "alternative proposals for a range of land

allocations, including different options for the percentage of lands that would be made available

for oil and gas leasing"). "BLM analyzes an IAP through an environmental impact statement ("EIS") prepared in accordance with [the National Environmental Policy Act ("NEPA")]." *Nat'l Audubon Soc'y v. Haaland*, No. 3:20-cv-206-SLG, 2023 WL 5984204, at *1 (D. Alaska Sept. 14, 2023). BLM's action adopting a final IAP occurs in a Record of Decision ("ROD"). *Id.* BLM issued IAPs in 2013, 2020, 2022, and 2025.

Plaintiff emphasizes the Petroleum Reserves Act's provision that exploration within certain designated areas, known as "special areas," must address "maximum protection" of surface values to the extent consistent with other oil and gas exploration requirements. *See* Mem. of Law in Supp. of Pl.'s Mot for Prelim. Inj. and Stay Under 5 U.S.C. § 705 5, 19, 22, Dkt. 12-1 ("Pl.'s Br.").[1] But while this language directs the Secretary to assure the maximum protection of significant subsistence, recreational, fish and wildlife, or historical or scenic value within special areas, as determined by the Secretary, that protection applies only insofar as it is consistent with the requirements of the Petroleum Reserves Act for the exploration and production of oil and gas resources within the NPR-A. *Id.*; 42 U.S.C. §§ 6504(a), 6504a(n)(2).

---

[1] The provision states in full:

Any exploration within the Utukok River, the Teshekpuk Lake areas, and other areas designated by the Secretary of the Interior containing any significant subsistence, recreational, fish and wildlife, or historical or scenic value, shall be conducted in a manner which will assure the maximum protection of such surface values to the extent consistent with the requirements of this Act for the exploration of the reserve.

42 U.S.C. § 6504(a).

2.      One Big Beautiful Bill Act

The President signed the "One Big Beautiful Bill Act" into law on July 4, 2025. *See* Pub.

L. No 119-21, 139 Stat. 72 (July 4, 2025) ("OBBBA").  Section 50105 addresses the NPR-A,

directing that "the Secretary shall expeditiously restore and resume oil and gas lease sales . . . in

the areas designated for oil and gas leasing as described in the [2020] NPR–A final

environmental impact statement and the [2020] NPR–A record of decision." *Id*. §§ 50105(b),

50105(a).  The Act further directs that "the Secretary shall conduct not fewer than 5 lease sales

under the Program by not later than 10 years after the date of enactment of this Act," each

offering at least 4 million acres, with the initial lease sale "not later than 1 year after the date of

enactment of this Act." *Id*. (c)(1) and (c)(2)(B)(i).  And it requires that the Secretary, in

conducting these lease sales, "shall offer the same lease form, lease terms, economic conditions

and stipulations as described" in BLM's 2020 IAP ROD governing NPR-A oil and gas leasing.

*Id*. (d).

3.      Congressional Review Act

On December 5, 2025, the President signed a joint resolution into law disapproving the

NPR-A April 2022 Integrated Activity Plan ("IAP") under the Congressional Review Act

("CRA"), 5 U.S.C. §§ 801-808. *See* Pub. L. No.  119-47, 139 Stat. 696 (Dec. 5, 2025).  The joint

resolution's passage means that the 2022 IAP "shall be treated as though [the 2022 IAP] had

never taken effect.," 5 U.S.C. § 801(f).  And that a new IAP "substantially the same as [the 2022

IAP] may not be issued." *Id*. § 801(b)(2).

**B.      Factual and Procedural Background**

The current IAP was adopted on December 22, 2025. *See* NPR-A 2025 IAP ROD, Ex. 1

hereto (Appx. C Maps, omitted to reduce file size).  This followed a series of planning efforts

including IAP RODs issued in 2013, 2020, and 2022.  *See Nat'l Audubon Soc'y*, 2023 WL

5984204, at *2 (D. Alaska, Case No. 3:20-cv-206-SLG).[2]  Organizational Plaintiffs challenged

the 2020 IAP ROD in the District of Alaska in the above-cited litigation, and recently amended

their complaint (now captioned *Center for Biological Diversity v. Burgum*) to challenge the 2025

IAP ROD.  While every aspect of its "complex procedural history" is not relevant here, that

litigation remains active and the parties have proposed a joint litigation schedule whereby the

merits will be fully briefed by July 2026.  *See* Pls.' & Fed. Defs.' Joint Mot. for Scheduling

Order 2, No. 3:20-cv-206-SLG, Dkt. 135, Ex. 2 hereto.  The proposed schedule does not

contemplate a motion for preliminary injunction, but instead requests a decision by October

2026, "if possible, before surface disturbing activities may be authorized for the winter of 2026-

27 pursuant to the new IAP or in newly leased areas[.]"  *Id*. at 3.

The 2025 IAP ROD complied with the OBBBA's direction to review and restore the

NPR-A Oil and Gas Leasing Program consistent with the 2020 IAP.  *See* 2025 ROD at 2-3.  The

ROD was based on the analysis presented in the 2020 EIS, as supplemented by a 2025

environmental assessment ("EA") that BLM prepared to consider new circumstances and

information post-dating the analysis in the 2020 IAP EIS.  *Id*. at 3.  The 2025 IAP makes

approximately 18.6 million acres of BLM-managed land in the NPR-A available for oil and gas

leasing.  *Id*. at 4.  But any leasing is deferred for at least ten years on approximately 132,000

---

[2]     While there technically have been four separate IAPs over time, in substance there have
been only two.  The 2013 and 2022 IAPs are effectively the same in material respects, as are the
2020 and 2025 IAPs.  *See* 2025 ROD at 13.

acres in the Teshekpuk Lake Special Area ("TLSA").  *Id*.  And the 2025 IAP includes other TLSA refinements, such as adopting science-based modifications of the TLSA boundary to include "additional area important to the Teshekpuk Caribou Herd for calving and insect relief habitat."  *Id*. at 6.  The 2025 IAP "makes available more land in the [TLSA] for new leasing and infrastructure," explaining that "[i]mportant surface resources in the [TLSA] are protected with the lease stipulations outlined in K-1, K-4, K-6, K-7, K-8, and K-9, as well as a host of required operating procedures that apply throughout the [NPR-A]."  *Id*.  These protections include activity buffers and no surface occupancy restrictions in the Caribou Herd Habitat Area and Movement Corridors.  *See id*. at B-12 to B-14 (Stipulations K-8, K-9).

On December 19, 2025, just before the 2025 IAP ROD was executed, the Department issued a decision cancelling the Teshekpuk Lake Conservation Right-of-Way ("TLCROW"). *See* Decision dated Dec. 19, 2025 (the "Decision"), Ex. 3 hereto.  Among other things, the TLCROW prohibited "[i]ssuance of new oil and gas leases for lands within the Protected Property" that encompassed the TLSA.  *See* TLCROW 7, Ex. 4 hereto.  The Decision explained that the Department was canceling the TLCROW under the Secretary's inherent authority to cancel conveyances made in violation of law because the TLCROW was not authorized under the Petroleum Reserves Act.  *Id*. at 5.  Finally, the TLCROW violated the sub-delegation doctrine because it gave the Trilateral veto authority over oil and gas development and transferred the function of mitigating effects from oil and gas activities in a meaningful portion of the NPR-A from the Secretary to the Trilateral.  *Id.* at 7-8.  Finally, the Decision also explained that cancellation of the TLCROW was necessary to allow BLM to issue an IAP that complied with the direction in the OBBBA to make available for leasing the areas designated for

oil and gas leasing and under the same lease form, lease terms, economic conditions and stipulations as described in the 2020 IAP ROD.  *See id*. 6-7, 10.[3]

Plaintiff filed this lawsuit on January 28, 2026.  *See* Compl., Dkt. 1.  Plaintiff's challenge focuses on the TLCROW and requests that the Court declare unlawful and vacate the Decision. *Id*. at 42 (Prayer for Relief).

On February 11, 2026, a Notice of 2026 [NPR-A] Oil and Gas Lease Sale was published in the Federal Register.  *See* 91 Fed. Reg. 6248 (Feb. 11, 2026).  Sealed bids must be submitted by 4 p.m. AKST on March 16, 2026, and a public opening and reading of the bids will occur at 10 a.m. AKST on March 18, 2026.  *Id*.[4]

On February 20, 2026, Plaintiff filed the instant motion for emergency relief.  *See* Pl.'s Mot. for Prelim. Inj. and Stay Under 5 U.S.C. § 705, Dkt. 12 (the "Motion").

## LEGAL STANDARDS

### I.    A Preliminary Injunction is an Extraordinary Remedy

A preliminary injunction is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief."  *Winter v. Nat. Res. Def. Council, Inc.*,

---

[3]    The TLCROW was evaluated, and eventually executed, in furtherance of Mitigation Measure 27 ("MM27") adopted as part of the Willow Master Development Plan Record of Decision.  *See* Appx. A, Mitigation Measures 30-31, Ex. 5 hereto.  MM27 falls within a suite of lease stipulations, required operating procedures, and other mitigation measures.  *See id*. at i (Table of Contents).

[4]    Other information regarding the lease sale has been made available through BLM's website, including lease sale tract maps, shapefiles, and a Detailed Statement of Sale.  *See* https://www.blm.gov/programs/energy-and-minerals/oil-and-gas/leasing/regional-lease-sales/alaska#docs (last viewed Feb. 27, 2026); *see also* Call for Nominations and Comments for the 2025 [NPR-A] Oil and Gas Lease Sale, 90 Fed. Reg. 48446 (Oct. 22, 2025).

555 U.S. 7, 22 (2008).  The movant "must establish that he is likely to succeed on the merits, that

he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of

equities tips in his favor, and that an injunction is in the public interest."  *Winter*, 555 U.S. at 20.

A preliminary injunction "should be granted only when the party seeking the relief, by a clear

showing, carries the burden of persuasion."  *Cobell v. Norton*, 391 F.3d 251, 258 (D.C. Cir.

2004).[5]

## II.    Administrative Procedure Act Review of Final Agency Action

Plaintiff brings its claims under the Administrative Procedure Act, 5 U.S.C. §§ 701-706

("APA"), which governs the Court's assessment of the likelihood of success prong of the

preliminary injunction standard.  The APA empowers a reviewing court to "hold unlawful and

set aside" final agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise

not in accordance with law."  5 U.S.C. § 706(2)(A).  "[J]udicial review of an administrative

decision" will not involve witness testimony or discovery practice, but "will be limited to the

administrative record."  *Trout Unlimited v. U.S. Dep't of Agric.*, 944 F. Supp. 13, 19 (D.D.C.

1996), *transferred to,* 320 F. Supp. 2d 1090 (D. Colo. 2004).[6]

---

[5]    Plaintiff also characterizes its motion as seeking a stay under 5 U.S.C. § 705, but correctly acknowledges that such a motion is analyzed under the same preliminary injunction standard.  *See* Pl.'s Br. 13.

[6]    Plaintiff has filed declarations in support of their motion for preliminary injunction.  *See* Decl. of George Sielak, Dkt. 12-5; Decl. of Eunice Brower, Dkt. 12-6.  Generally, in APA review of final agency action "the focal point for judicial review should be the administrative record already in existence, not some new record made initially in the reviewing court."  *Camp v. Pitts*, 411 U.S. 138, 142 (1973).  However, Defendants acknowledge that one of the limited exceptions to this rule involves evaluating irreparable injury in the context of a motion for preliminary injunction.  *See Am. Rivers v. U.S. Army Corps of Eng'rs*, 271 F. Supp. 2d 230, 247 (D.D.C. 2003).  Defendants, therefore, do not object to the proffered declarations for that limited

This "arbitrary and capricious standard" is a "highly deferential standard," *Zevallos v. Obama*, 793 F.3d 106, 112 (D.C. Cir. 2015) (citation omitted), and "[t]he agency's decision is presumed to be valid." *Chamber of Com. of U.S. v. NLRB*, 118 F. Supp. 3d 171, 182 (D.D.C. 2015) (citing *Am. Radio Relay League, Inc. v. FCC,* 617 F.2d 875, 879 (D.C. Cir. 1980)). Indeed, the APA "mandate[s] that judicial review of agency policymaking and factfinding be deferential." *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 392 (2024).

"To survive review under the 'arbitrary and capricious' standard, an agency must 'examine the relevant data and articulate a satisfactory explanation for its action including a rational connection between the facts found and the choice made.'" *PPL Wallingford Energy LLC v. FERC,* 419 F.3d 1194, 1198 (D.C. Cir. 2005) (quoting *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.,* 463 U.S. 29, 43 (1983)). A reviewing court "will uphold [an agency's] findings, though of less-than-ideal clarity, if the agency's path may be reasonably discerned[.]" *WildEarth Guardians v. Salazar*, 741 F. Supp. 2d 89, 97 (D.D.C. 2010) (quoting *Hall v. McLaughlin,* 864 F.2d 868, 872 (D.C. Cir. 1989)) (alterations in original). "[T]he party challenging an agency's action as arbitrary and capricious bears the burden of proof." *City of Olmsted Falls v. FAA*, 292 F.3d 261, 271 (D.C. Cir. 2002) (quoting *Lomak Petroleum, Inc. v. FERC*, 206 F.3d 1193, 1198 (D.C. Cir. 2000)) (alteration in original). And "[e]ven assuming [the agency] made missteps . . . the burden is on petitioners to demonstrate that [the agency's] ultimate conclusions are unreasonable." *Nat'l Petrochemical & Refiners Ass'n v. EPA*, 287 F.3d

---

purpose. But any reliance on those declarations for arguments concerning Plaintiff's likelihood of success on the merits is improper and should be stricken. *See*, *e.g*., Pl.'s Br. 28-29 (offering Sielak Decl. as evidence to support Plaintiff's "reliance interests" argument).

1130, 1146 (D.C. Cir. 2002).

When reviewing agency action under the APA, "[c]ourts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority[.]" *Loper Bright*, 603 U.S. at 412. To resolve the meaning of disputed statutory language, a court shall adopt the interpretation that the court, "after applying all relevant interpretive tools, concludes is best." *Id.* at 400. "Careful attention to the judgment of the Executive Branch may help inform that inquiry." *Id.* at 413.

## ARGUMENT

Plaintiff's motion should be denied. The failure to show irreparable injury is alone sufficient to deny the motion. The Motion should be further denied because Plaintiff's arguments on the merits are not likely to succeed. The inability to satisfy either of these requirements precludes entry of a preliminary injunction.

### I.    Plaintiff Fails to Show a Likelihood of Imminent, Irreparable Injury

Plaintiff's motion should be denied because it fails to clear the "high standard" of demonstrating irreparable injury. *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 297 (D.C. Cir. 2006) (recognizing that preliminary injunctive relief should be denied if a movant cannot show irreparable injury, notwithstanding the movant's showing under the other three factors). The injury "must be both certain and great; it must be actual and not theoretical." *Id*. (quoting *Wisc. Gas Co. v. FERC,* 758 F.2d 669, 674 (D.C. Cir. 1985) (*per curiam*)). Plaintiff must also show that "[t]he injury complained of is of such *imminence* that there is a 'clear and present' need for equitable relief to prevent irreparable harm." *Id.*; *see also Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) (the purpose of a preliminary injunction "is merely to

preserve the relative positions of the parties" until a court can resolve the merits). Since "a mere possibility of irreparable harm will not suffice," showing a likelihood of irreparable injury is sometimes considered "the *sine qua non* for obtaining a preliminary injunction – it is what justifies the extraordinary remedy of granting relief before the parties have had the opportunity fully to develop the evidence and fully to present their respective cases." *Cal. Ass'n of Priv. Postsecondary Sch. v. DeVos*, 344 F. Supp. 3d 158, 167 (D.D.C. 2018) (citation omitted).

The Alaska district court has decisively ruled that mere issuance of oil and gas leases on Alaska's North Slope does not justify preliminary injunctive relief. *See Gwich'in Steering Comm. v. Bernhardt*, No. 3:20-cv-204-SLG, 2021 WL 46703 (D. Alaska Jan. 5, 2021). Against purported concerns about irretrievable commitment of resources, damage from exploration and other ground-disturbing activities, and aerial overflights and other alleged harassment of wildlife and human visitors, the Alaska court found plaintiffs "have not established a likelihood that those activities will occur before the Court issues a final ruling on the merits," particularly given the fact that BLM would have to undertake further analysis and issue further authorizations for future on-the-ground actions. *Id.* at *7-8.

Retracing and fortifying the analysis of *Gwich'in Steering Committee* starts with the observation that conducting a lease sale and issuing a lease(s), are merely preliminary steps in an oil and gas program and do not authorize any ground disturbance. *SeeGwich'in Steering Comm.*, 2021 WL 46703, at *8. This is evident both from the governing IAP and from relevant BLM regulations. *See* 2025 IAP ROD at 9 (explaining that the ROD does not itself authorize any specific on-the-ground activity associated with the exploration for or development of oil and gas, and that such actions require separate BLM approvals); 43 C.F.R. Part 3130 (describing separate

regulatory stages for leasing, exploration, and production).  The Alaska court's ruling extended holdings from other courts that merely conducting an oil and gas lease sale does not result in the irreparable harm to the environment necessary for granting a preliminary injunction.  *See Amoco Prod. Co. v. Vill. of Gambell*, 480 U.S. 531, 544-45 (1987) (reversing a preliminary injunction regarding oil and gas leases because "injury to subsistence resources from exploration was not at all probable"); *Tribal Vill. of Akutan v. Hodel*, 859 F.2d 662, 664 (9th Cir. 1988) (dissolving a preliminary injunction regarding an oil and gas lease sale and finding that "none of the activities of the lease sale stage results in harm to the environment"); *Blanco v. Burton*, No. Civ.A. 06-3813, 2006 WL 2366046, at *15-19 (E.D. La. Aug. 14, 2006) (denying an injunction and finding that holding an offshore oil and gas lease sale did not result in imminent environmental harm); *N. Slope Borough v. Minerals Mgmt. Serv.*, No. 3:07-cv-45-RRB, 2007 WL 1106110, at *4 (D. Alaska Apr. 12, 2007) (denying a preliminary injunction regarding an oil and gas lease sale).

An additional important aspect of the Alaska court's ruling is the recognition that the failure to demonstrate irreparable injury caused by lease issuance does not foreclose a court's ability to, "if warranted, order appropriate equitable relief at the merits stage."  *Gwich'in Steering Comm.*, 2021 WL 46703 at *9; *see also* n.91 ("Relief may include, in an appropriate case, the rescission of leases.").  In essence, "the filing of this suit acts as a lis pendens on the lease sale."  *N. Slope Borough v. Andrus*, 486 F. Supp. 326, 331 (D.D.C. 1979).  This principle is particularly important here, because Plaintiff fails to tie its various theories of irreparable harm to lease issuance.  *See* Pl.'s Br. 31-32.  For example, a "cloud on title" or "shield against private exploitation," *see id*., will not occur upon issuance of a lease, but only following subsequent approvals (through separate agency decisions).  Thus, Plaintiff will have suffered no irreparable

12

injury if a lease is issued, no applications for ground-disturbing activity are presented (or granted), and Plaintiff ultimately succeeds in having the Decision vacated.

As if all of this was not clear enough, developments in the ongoing Alaska litigation demonstrate that other North Slope litigants recognize the inadvisability of seeking to preliminarily enjoin an NPR-A lease sale.  The February 20, 2026, joint scheduling motion filed in *Center for Biological Diversity* reflects an apparent choice by plaintiffs to avoid revisiting a motion for preliminary injunction before the Alaska court, in furtherance of reaching agreement on a somewhat expedited schedule for an APA record review case intended to facilitate entry of a final judgment "before surface disturbing activities may be authorized for the winter of 2026-27 pursuant to the new IAP or in newly leased areas."  Joint Motion for Scheduling Order 3, Ex. 2 hereto.

Plaintiffs offer a smattering of citations to case law, but none of them involve oil and gas leases in Alaska or otherwise provide a basis to deviate from the analysis of *Gwich'in Steering Committee*.  Perhaps their closest fit is *National Wildlife Federation v. Burford*, 835 F.2d 305 (D.C. Cir. 1987), which at least involved the possibility of resource development on public lands. *See* Pl.'s Br. 32, 34.  But even Plaintiff offers *Burford* with anticipatory damage control, because that litigation did not become known for the district court's 1985 evaluation of irreparable injury in granting a preliminary injunction, but for the Supreme Court's analysis concluding plaintiffs lacked standing to bring the case at all.  *See* Pl.'s Br. 32 n.13 (citing *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871 (1990)).  And the district court's analysis of irreparable injury should inspire little confidence because it flips the analysis on its head, acknowledging that hypothetical future ground disturbance would require future agency action under "discretionary land laws" yet

still finding the release of a broader "protective" shield against such development to constitute irreparable injury. *Nat'l Wildlife Fed'n v. Burford*, 676 F. Supp. 271, 278-79 (D.D.C. 1985), *aff'd*, 835 F.2d 305 (D.C. Cir. 1987). The lack of a continuing line of authority in the ensuing 40 years suggests that *Burford*'s analysis has not been found compelling, even assuming it could be reconciled with *Winter*. *Compare Burford*, 676 F. Supp. at 277 (stating it was "well settled" that the preliminary injunction standard requires consideration of "the prospect of irreparable injury," *with Winter*, 555 U.S. at 22 (the "'possibility' standard is too lenient").

In sum, Plaintiff's motion must be denied for the same reasons explained by the Alaska court in January 2021. Issuance of North Slope oil and gas leases does not provide a basis for finding irreparable injury, because such leases do not authorize imminent ground-disturbing activity. Without being able to show a likelihood of irreparable injury, Plaintiff's motion must be denied.

## II.    Plaintiff is Unlikely to Succeed on the Merits

Plaintiff's Motion must also be denied because Plaintiff fails to demonstrate it is likely to prevail on the merits. Plaintiff offers approximately ten different arguments on the merits, but they all flow from, or fail to address, Plaintiff's misunderstanding of the combined effect of the Petroleum Reserves Act, OBBBA, and Congressional disapproval of the 2022 IAP under the Congressional Review Act. Defendants, therefore, first address the manner in which these guideposts constrain BLM's discretion and render the TLCROW unlawful.

As a threshold matter, the Court can address the likelihood of success on the merits without having the complete administrative record before it, *see Am. Bioscience, Inc. v. Thompson*, 243 F.3d 579 (D.C. Cir. 2001), because Plaintiffs' claims can be substantially, if not

14

entirely, reviewed as a matter of statutory interpretation.  Even putting their purely (or largely)

legal nature aside, moreover, there are ways to address the merits prong of a motion for

preliminary injunction before the full administrative record becomes available.  *See*, *e.g.*, *Red*

*Lake Band of Chippewa Indians v. U.S. Army Corps of Eng'rs*, No. 20-cv-3817 (CKK), 2021

WL 430054, at *7 (D.D.C. Feb. 7, 2021) (citing *American Bioscience* and proceeding to consider

the likelihood of success on the merits where the parties agreed that relevant agency documents,

which would be part of the administrative record, when finalized, had been filed in conjunction

with the preliminary injunction proceedings); *see also* 5 U.S.C. § 706 (allowing judicial review

on either "the whole record or those parts of it cited by a party").[7]

A.    A Prohibition on Leasing in the TLCROW Is Unlawful

Plaintiff cannot avoid the fact that Congress has prevented BLM from administering a

prohibition on oil and gas leasing in the TLCROW.

Congress has exercised its plenary authority over public lands and has spoken with

particular clarity and force regarding management of the NPR-A.  The Property Clause gives

Congress the "[p]ower to dispose of and make all needful Rules and Regulations respecting the

Territory or other Property belonging to the United States[.]"  U.S. Const. art IV, § 3, cl. 2.  The

Supreme Court has "repeatedly observed that the power over the public land thus entrusted to

---

[7]    A rigid application of *American Bioscience* would be problematic – while it addressed
the denial of a motion for a preliminary injunction, finding a likelihood of success on the merits
sufficient to grant a preliminary injunction in the absence of an administrative record would
seem at least equally problematic.  Put differently, it cannot be that a full administrative record is
always required to deny a motion for preliminary injunction, any more than the absence of an
administrative record can be a basis for granting one.

Congress is without limitations." *Kleppe v. New Mexico*, 426 U.S. 529, 539 (1976) (citation modified).

The Petroleum Reserves Act is intended to facilitate the leasing, exploration, and development of oil and gas resources. And if this command was not clear enough following the Act's passage, in 1980 Congress further directed the Secretary "to conduct 'an expeditious program of competitive leasing of oil and gas in the' NPR-A." *Sovereign Iñupiat*, 2023 WL 2759864, at *1 (quoting Pub. L. No. 96-514, 94 Stat. 2957, 2964 (1980) (codified at 42 U.S.C. § 6506a)). The Petroleum Reserves Act set out to accomplish this goal, in part, by proverbially *wiping the slate clean* and withdrawing all lands within the NPR-A "from all forms of entry and disposition under the public land laws" subject to further actions by the Secretary to effectuate the purposes of the Act. 42 U.S.C. § 6502. And while this section allows the Secretary to "grant such rights-of-way, licenses, and permits as may be necessary to carry out his responsibilities under [the] Act," *id*., that responsibility is to provide for leasing, exploration, and development of oil and gas resources. *See* 42 U.S.C. § 6506a; Decision at 4. Interior is therefore only empowered to grant "rights-of-way related to oil and gas activities"; it cannot grant a right of way "that is specifically intended to prohibit or otherwise hinder oil and gas activities in the NPR-A." Decision at 4-5. "In sum, the TLCROW is inherently at odds with the text and purpose of the [Petroleum Reserves Act] because the ROW grants a third party the right to prohibit core activities directly related to the NPR-A's dominant use." *Id*. at 6.

Next, the OBBBA requires that lands be made available for oil and gas leasing in the same areas as designated in the 2020 IAP EIS and the 2020 IAP ROD and further mandates that leasing be conducted pursuant to the "same lease form, lease terms, economic conditions, and

stipulations" as described in the 2020 IAP EIS and IAP ROD.  OBBBA §§ 50105(b), (d).

Therefore, once the OBBBA was enacted, BLM was required to issue an IAP that reflected the

oil and gas leasing framework set out in the 2020 IAP ROD.  And "[t]he 2020 IAP designated

land for oil and gas exploration and development where such activity is prohibited under the

TLCROW[.]"  Decision at 3, 6 (the TLCROW prohibits oil and gas leasing "in approximately 1

million acres in the area of Teshekpuk Lake").  Maintaining the TLCROW's blanket prohibition

against oil and gas leasing would have prevented BLM from complying with the OBBBA's

express directive to "expeditiously restore and resume oil and gas lease sales . . . in the areas

designated for oil and gas leasing as described in the [2020] NPR–A final environmental impact

statement and the [2020] NPR–A record of decision."  OBBBA §§ 50105(a), 50105(b).[8]

  The December 2025 Congressional disapproval of the 2022 IAP makes all of this

indisputably clear.  Plaintiff's arguments start from premise that the 2022 IAP made only 7,000

acres within the TLCROW available for leasing, and that the TLCROW was intended to reduce

that number to zero.  *See* TLCROW at 2.  But Congress has forbidden this result, because

passage of the joint resolution of disapproval means the 2022 IAP "shall be treated as though [it]

had never taken effect," 5 U.S.C. § 801(f).  And the joint resolution has the further effect of

---

[8] Plaintiffs do at least acknowledge the Decision's analysis of the OBBBA mandate that
BLM make lands within the TLCROW available for leasing.  *See* Pl.'s Br. 25.  And they respond
by saying that this reasoning is deficient because "Interior's logic would require it to cancel all
leases" in an area that the OBBBA directs must be available for leasing.  *Id*.  This argument
collapses on itself; BLM does not need to cancel a previously issued lease *for oil and gas
development* (as opposed to one with precisely the opposite purpose) to comply with the OBBA
because the existence of a lease would make obvious that BLM made the subject land available
for leasing.

directing that a new IAP "substantially the same as [the 2022 IAP] may not be issued."  *Id*. §
801(b)(2).

No amount of legal maneuvering can avoid Congressional direction here.  Congress has
directed where leases must be offered in the NPR-A and the "lease form, lease terms, economic
conditions, and stipulations" to be included in any leases that issue.  *See* OBBA §§ 50105(b), (d).
The TLCROW ran afoul of Congressional direction in the Petroleum Reserves Act at its
inception, a conclusion confirmed by Congress's passage of the OBBBA and resolution of
disapproval under the Congressional Review Act, and was properly cancelled by the Decision.

B.      Plaintiff's Assorted Arguments Cannot Overcome Congressional Direction

Plaintiff offers numerous legal theories that seek to avoid this conclusion.  *See* Pls.' Br.
14-31.  None succeed.

1.      *Interior Properly Exercised Authority to Cancel the TLCROW*

Plaintiff starts by arguing that an agency can only act pursuant to an express
Congressional conferral of authority, suggesting that the Petroleum Reserves Act authorizes only
the granting of a right-of-way but "provides no mechanism to cancel those grants once they
issue."  Pl.'s Br. 14.  But this argument makes little sense, because it would mean that "our
government" is perpetually stuck with a bad bargain, no matter how improvidently it was entered
and even if the government lacked the authority to grant it.  And these concerns should loom
large here, where the TLCROW enlisted a private party to frustrate oil and gas development
required under applicable law.  TLCROW at 2.

Interior has authority to issue the Decision because "[t]he Secretary has inherent
authority, under his general managerial power over public lands, to cancel authorizations issued

in violation of law."  Decision at 4.  (citing *Boesche v. Udall*, 373 U.S. 472 (1963)). The

Secretary is empowered to "perform all executive duties . . . in anywise respecting" the "public

lands of the United States[.]" 43 U.S.C. § 2.  This provision "vest[s] the Secretary with general

managerial powers over the public lands." *Boesche*, 373 U.S. at 476 & n.6; *see also Cameron v.*

*United States*, 252 U.S. 450, 459-60 (1920).  Because "statutes written in broad, sweeping

language should be given broad, sweeping application," *Consumer Elecs. Ass'n v. FCC*, 347

F.3d 291, 298 (D.C. Cir. 2003), it is reasonable to conclude that this general authority enabled

the Secretary to "correct [the] errors" of her predecessor that have become apparent through

additional review and evolved Congressional direction (or case law).  *Boesche*, 373 U.S. at 478.

This authority has been recognized in numerous factual contexts by various courts. *See*

*Silver State Land, LLC v. Schneider*, 843 F.3d 982, 990 (D.C. Cir. 2016) (*Boesche* "confirmed

the Secretary's authority to cancel a 'lease administratively for invalidity at its inception,' even

after the lease had been issued" (citation omitted)); *Winkler v. Andrus*, 614 F.2d 707, 711 (10th

Cir. 1980) (recognizing the Secretary's "broad authority to cancel an oil and gas leases for

violations of the Mineral Leasing Act and regulations thereunder, as well as for administrative

errors committed before the lease was issued"); *cf. Texas Oil & Gas Corp. v. Andrus*, 498 F.

Supp. 668, 675 (D.D.C. 1980) (citing *Boesche* to support cancellation of oil and gas lease

improperly issued inside military base), *rev'd sub. nom on other grounds*, *Texas Oil & Gas*

*Corp. v. Watt*, 683 F.2d 427 (D.C. Cir. 1982); *Texaco, Inc. v. Hickel*, 437 F.2d 636, 641 (D.C.

Cir. 1970) (recognizing the Secretary's authority "to cancel a lease administratively for invalidity

in its inception" where "a determination required by law had not been made") (citation

modified).

19

As detailed above, Interior properly concluded that the TLCROW was "inherently at odds with the text and purpose of the NPRPA because the ROW grants a third party the right to prohibit core activities directly related to the NPR-A's dominant use[.]"  Decision at 6.  The Court need not go further, as that rationale alone is enough to conclude that Plaintiff is unlikely to succeed on the merits.

> 2. *Interior Properly Found the TLCROW to Be an Unlawful Sub-Delegation*

Even if the Court does go further, the Decision also correctly concluded that the TLCROW was independently unlawful because it "sub-delegated its authority wholesale to an entity outside the agency without congressional authorization." *Id*. at 7.  Plaintiff's efforts to rebut this conclusion are unavailing.  *See* Pl.'s Br. 24-25.

There are limits on an agency's ability to delegate authority.  Where a statute delegates authority to a federal officer, that authority "to a subordinate federal officer or agency is presumptively permissible absent affirmative evidence of a contrary congressional intent." *U.S. Telecom Ass'n v. F.C.C.*, 359 F.3d 554, 565 (D.C. Cir. 2004).  But there is "an important distinction between subdelegation to a *subordinate* and subdelegation to an *outside party*." *Id*. "Indeed, if anything, the case law strongly suggests that subdelegations to outside parties are assumed to be improper absent an affirmative showing of congressional authorization." *Id*. While it may not be impermissible to create an advisory body that might provide a recommendation to the proper agency official, the Secretary "cannot wholly delegate his responsibility to a local entity which is not bound by the statutory obligations set forth above." *Nat'l Park & Conservation Ass'n v. Stanton*, 54 F. Supp. 2d 7, 18 (D.D.C. 1999).

20

The TLCROW epitomizes this unlawful wholesale delegation of authority.  In the TLCROW the "United States" purports to "convey to [Trilateral]" the "right to take legal and any other lawful action to prevent any activity on or use of the Protected Property that is prohibited by or inconsistent with the purpose of this Grant[.]"  TLCROW at 4.  And it goes further, purporting to empower the Trilateral to "require the restoration of such areas or features of the Protected Property at the sole cost and expense of those responsible for the damage."  *Id*. And while the imprecision of empowering the Trilateral to take legal action against activities "inconsistent with the purpose of this Grant" may raise concern, there is little question that a purpose (if not the primary purpose) of the Grant is to prohibit "[i]ssuance of new oil and gas leases for lands" within the TLCROW.  *Id*. at 6.[9]

3.    *Plaintiff's Procedural Roadblocks All Fail*

Plaintiff's remaining arguments all mistakenly posit that Interior inadequately addressed (or entirely ignored) some procedure or finding that was a prerequisite to canceling the TLCROW.  These arguments are sparsely developed and rely on plainly distinguishable case law, particularly given the clear Congressional direction regarding the prospect of oil and gas leasing within the NPR-A and the area covered by the TLCROW.

---

[9]    The TLCROW includes many other curious provisions.  For example, it purportedly authorizes Trilateral to enter property within the TLCROW at reasonable times to conduct an inspection, restricting only "access to the interior of buildings and structures that are not open to the public."  *Id*. at 4.  And it empowers Trilateral to initiate the "enforcement" provisions of the agreement, apparently to include a circumstance in which BLM might offer leases within the TLCROW to comply with the OBBBA.  *Id*. at 7.

These efforts start with the argument that the Decision reflects an unlawful "change in position." Pl.'s Br. 26-27. But the Decision is not an "eleventh hour" reversal of "policies and standards," *id.* (internal quotation marks and citations omitted), but cancellation of an unlawfully issued instrument by the prior Administration purporting to convey an interest relating to public lands, in contravention of clear Congressional direction. And even if there was (there is not) a procedural duty on the agency to address the "change" occasioned by the Decision, see *Fed. Commc'ns Comm'n v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009), the Decision amply satisfies that requirement. *See* Decision at 4-6. It is difficult to see how the agency could have been more clear in its rationale for any "change" – it concluded that the issued authorization was unlawful (and explained why).

Plaintiff next advances two arguments erroneously suggesting that maintaining the TLCROW was necessary to address a nondiscretionary duty, and that BLM failed to consider an "important aspect of the problem" by considering an alternative to canceling the TLCROW. Pl.'s Br. 27-28. These arguments are similarly unpersuasive. MM27 does not impose a nondiscretionary duty, but states that BLM will "explore" the possibility of creating a "conservation instrument" and otherwise provide "a proposal for stakeholder engagement and implementation[.]" Willow Mitigation Measures, Ex. 5 hereto at 30-31. BLM plainly has discretion in determining how to address ongoing mitigation of impacts associated with the Willow Project. The Decision does not reject BLM's discretionary mitigation duties, but instead directs BLM to "implement MM27 in consultation with key stakeholders and in a way that conforms with the laws governing the BLM's management of the NPR-A." Decision at 9.

Indeed, the Decision properly restores BLM's discretion to address its mitigation duties by wresting that authority back from a third party.

Next, Plaintiff contends that BLM failed to consider reliance interests in cancelling the TLCROW. Pl.'s Br. 28-29. This argument improperly relies on a declaration from local residents that was not before the agency at the time of its decision, and thus cannot be considered now in determining whether the agency's action satisfied the APA standard of review. Regardless, *MediNatura, Inc. v. FDA* does not prohibit taking action that might affect asserted reliance interests; it only addresses the manner in which an agency must, in changing policy, be "cognizant" of "serious reliance interests" that may have developed under "longstanding policies." 998 F.3d 931, 940 (D.C. Cir. 2021) (internal quotation marks and citations omitted). The case reflects the typical context where shifting agency rules or regulatory standards impose undue compliance burdens or result in the loss of significant sunk costs across an industry. Those circumstances are clearly not present here. And again, the Decision considered any "disruptive consequences of cancellation" and reasonably found them "to be minimal." Decision at 9.

Plaintiff next shifts from discussion of what feels like a contract dispute into an argument that BLM "appears to have wholly ignored" an alleged NEPA requirement to consider whether the Decision required preparation of an EIS. Pl.'s Br. 29-30. However, NEPA does not require an agency to prepare an EIS to evaluate "the environmental impact of an action it could not refuse to perform." *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 769 (2004). And if "a clear and unavoidable conflict in statutory authority exists, NEPA must give way." *Flint Ridge Dev. Co. v. Scenic Rivers Ass'n of Okla.*, 426 U.S. 776, 788 (1976). This argument must be rejected,

with others, for failing to recognize clear Congressional direction that BLM make lands within

the TLCROW available for oil and gas leasing.

Finally, Plaintiff goes a step further to assert a violation of Constitutional due process.

Pl.'s Br. 30-31. That is incorrect as a matter of law. The TLCROW, which has now been shown

to suffer significant legal defects, did not create constitutionally protected property interests.

And Trilateral was not deprived of any process that was due.

A procedural due process claim initially raises two questions – was the claimant deprived

"of a protected property interest," and, if so, "what process was due?" *Amoco Prod. Co. v. Fry*,

118 F.3d 812, 819 (D.C. Cir. 1997) (citation omitted). Plaintiff's argument founders at the first

requirement, because it cannot show that the unlawfully issued TLCROW gave rise to a

protected property interest. In the closest thing to an analogous circumstance, if a lease turns out

to have been issued in violation of underlying law, "[n]o property right was created, therefore no

due process right was violated." *Shiny Rock Min. Corp. v. United States*, 825 F.2d 216, 219 (9th

Cir. 1987). This analysis is applied in other contexts to conclude that a protected due process

interest was never created. *See Bradley v. Vill. of Univ. Park, Ill.*, 59 F.4th 887, 902 (7th Cir.

2023) (plaintiff's "employment contract was void ab initio, so it could not serve as the source of

a federal due process right"). The Decision thus falls within "the Secretary's traditional

administrative authority to cancel on the basis of pre-lease factors." *Boesche*, 373 U.S. at 479.

Plaintiff, in sum, has not shown a likelihood of success on the merits, and its motion

should be independently denied on this basis.

### III.    The Balance of Equities and Public Interest Favor Defendants

Plaintiff must finally also prove that its requested preliminary injunction would serve the public interest.  *eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).  When the government is a party, the analyses of the public interest and balance of equities merge.  *See Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also Pursuing Am.'s Greatness v. FEC*, 831 F.3d 500, 511 (D.C. Cir. 2016) ("the government's interest *is* the public interest").  When addressing these factors, "courts 'must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief.'"  *Winter*, 555 U.S. at 24 (citation omitted).

The Court need not reach these factors, but here again, these factors require consideration of complex factors, found in at least some instances by the Alaska court to militate against a preliminary injunction.  *See Sovereign Iñupiat*, 2023 WL 2759864, at *11-14.  For similar reasons here, Plaintiff falls short of its burden to show that the balance of the equities and public interest favor granting a preliminary injunction.

### IV.    Any Injunction Must Be Narrowly Tailored

The Court should deny Plaintiff's motion and therefore need not consider the scope of any injunctive relief.  However, if the Court does reach this question "injunctive relief should be no more burdensome . . . than necessary to provide complete relief to the plaintiff[ ]."  *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Trump v. CASA, Inc.*, 606 U.S. 831, 862 (2025) (Thomas, J., concurring) ("In no circumstance can a court award relief beyond that necessary to redress the plaintiffs' injuries.").  Plaintiff's request for relief addresses only lands within the

former TLCROW and is thus much narrower than Plaintiffs' requested relief in *Grandmothers Growing Goodness*.

Finally, should the Court be inclined to order any injunctive relief, the Court should require Plaintiff to post security.  Under Federal Rule of Civil Procedure 65(c), the Court may issue a preliminary injunction "only if the movant gives security" for "costs and damages sustained" by Defendants if they are later found to "have been wrongfully enjoined."  Fed. R. Civ. P. 65(c).  The Court has broad discretion in determining the proper amount of the bond.  *See DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999).

## <u>CONCLUSION</u>

For all these reasons, the Court should deny Plaintiff's Motion for a Preliminary Injunction and Stay Under 5 U.S.C. § 705.

Respectfully submitted this 27th day of February 2026.

<div style="margin-left: 40%;">

ADAM R.F. GUSTAFSON
Principal Deputy Assistant Attorney General
United States Department of Justice
Environment and Natural Resources Division

*/s/ Paul A. Turcke*
PAUL A. TURCKE (Idaho Bar # 4759)
Trial Attorney, Natural Resources Section
1290 West Myrtle Street, Suite 500
Boise, ID 83702
(202) 532-5994
paul.turcke@usdoj.gov

*Counsel for Defendants*

</div>

*Of Counsel*:

JOSHUA HANSON
JASON HARTZ
Office of the Solicitor
United States Department of the Interior

26